IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,           ) | |
| ) | |
| Plaintiff,               ) | CRIMINAL NO. 22-1405 WJ |
| ) | |
| vs.                                        ) | |
| ) | |
| **HERMAN LEYVOUNE WILSON, a.k.a.**  ) | |
| **Bilal Mu'Min Abdullah**            ) | |
| ) | |
| Defendant. | |

MOTION TO DETAIN DEFENDANT PENDING TRIAL

The United States respectfully submits this motion to detain the defendant, HERMAN LEYVOUNE WILSON (hereinafter, "Defendant"), pending trial on the indictment. *See* 18 U.S.C. § 3142. Defendant has openly professed allegiance to ISIS, a well-known foreign terrorist organization, radicalized others, attempted to create a training center for ISIS supporters in Albuquerque, and attempted to provide material support for ISIS. Defendant also indicated a desire to travel to Egypt and support ISIS by providing equipment to the organization. Under these circumstances, Defendant poses a risk of flight and danger to the community that this Court cannot mitigate with any conditions of release – no matter how restrictive. *See* 18 U.S.C. § 3142(e). This Court should therefore order Defendant remanded to the custody of the U.S. Marshals Service pending trial.

I.       RELEVANT FACTS AND PROCEDURAL HISTORY

Defendant has openly advocated support for ISIS, which is not, by itself, a crime. However, Defendant has attempted to establish a mosque in New Mexico that would teach ISIS's ideology, provide training in tactical maneuvers and martial arts, and serve as a safe haven

for individuals preparing to travel and fight on behalf of ISIS and wage jihad on behalf of ISIS in the United States and abroad.[1] Defendant has spread ISIS propaganda, recruited pro-ISIS individuals to join online groups, and attempted to provide personnel, services, and other support to ISIS members. Defendant has also attempted to contact a media organization affiliated with ISIS with the stated intent of partnering his proposed mosque/training center with ISIS.

Defendant is charged with violations of 18 U.S.C. § 2339B(a)(1), Attempt to Provide Material Support to a Designated Foreign Terrorist Organization; and 18 U.S.C. § 1512(c)(1), Tampering With a Witness, Victim or Informant; 18 U.S.C. § 2(a) Aiding and Abetting. Defendant faces at least 151-188 months incarceration for each count.

II.      APPLICABLE LAW

A defendant charged with a criminal offense is entitled to a hearing before a magistrate judge on the issue of his or her pre-trial detention. *See* 18 U.S.C. §§ 3142(f). At such a hearing, the magistrate judge must consider "(1) the nature and circumstances of the offense charged[;] … (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including … [the defendant's] criminal history … and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

18 U.S.C. § 2339B is an enumerated crime under 18 U.S.C. § 2332b(g)(5)(B). Because the maximum sentence is ten years or more upon conviction, there is a presumption that no condition or combination of conditions will reasonably assure the appearance of the person and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(C). At a detention hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence and proving

---

[1] "Jihad" is an Arabic word meaning "struggle." As used by Defendant, it means violent struggle against the enemies of Islam.

dangerousness by clear-and-convincing evidence. *See* 18 U.S.C. § 3142(f); *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003). The ultimate "burden of persuasion … always remains with the [United States]." *United States v. Stricklin*, 932 F.2d 1353, 1354 (10th Cir. 1991).

At the completion of the detention hearing, the magistrate judge shall issue a detention order, pursuant to 18 U.S.C. § 3142(i), when "the jud[ge] finds that no … conditions [of release] will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). However, the magistrate judge may release the defendant from custody when the defendant's risk of flight and danger to the community can be adequately mitigated. *United States v. Bustamante-Conchas*, 577 Fed. Appx. 803, 805 (10th Cir. 2014).

  III.  ARGUMENT FOR DETENTION

This Court should remand Defendant to the custody of the U.S. Marshals pending trial. Defendant poses a very serious flight risk in that he has already contemplated leaving the country, prior to being charged. Defendant poses an extreme danger to the community given his stated intent to act violently on behalf of his ideology, his weapons and combat practice, and his history of illegally possessing weapons. The government addresses each of the four factors supporting detention in further detail below.

  A.  Nature and Circumstances of the Offense

Defendant's intentions were dangerous: he attempted to provide material support to a foreign terrorist organization for the purpose of aiding that group in its ongoing war in the Middle East. Defendant faces well over 10 years' incarceration if convicted. *See* 26 U.S.C. § 5871. Naturally, the probability of such a long term of imprisonment gives Defendant a

powerful incentive to flee.  *See United States v. Munoz-Hernandez*, No. CR 12-0128 JB, 2012 U.S. Dist. LEXIS 161970, at *31-32 (D.N.M. Nov. 5, 2012)(Browning, J.)(noting that "[i]n the face of such a lengthy term of imprisonment [10 years to life], and the evidence against him, [the defendant] might be tempted to flee . . . rather than spend a good portion of his life in an American prison").  Of note, Defendant's advisory guideline range is likely to be far in excess of the statutory maximum for these offenses.  *See* U.S.S.G. 3A1.4 (prescribing a criminal history category of VI and a 12-point offense level increase if the offense was intended to promote a federal crime of terrorism).  Defendant's history of violating the law, coupled with the nature and surrounding circumstances of the charged offenses provide very compelling reasons to remand Defendant to the custody of the U.S. Marshals pending trial.

   B.  Weight of the Evidence

   The evidence supporting the indictment is strong.  A Confidential Human Source (CHS) has personally observed all of the facts alleged herein.  Most of those facts are also supported by photographic, documented, and otherwise recorded means, which contain Defendant's own words and actions.

   <u>Radicalizing Others Towards Violent Jihad</u>

i.  Between May 2019 and September 2020 Defendant helped to administer an online platform through Telegram's encrypted application.  The purposes of this online platform were to promote ISIS ideology, to recruit others to ISIS's ideology and to discuss ISIS/terrorist attacks in the United States and overseas.  Defendant also used the online platform to promote and find potential like-minded individuals to join the Islamic State Center, in Albuquerque.  The CHS posed as a member of this group and had in-person meetings with Defendant and other group members.

ii. Defendant's efforts have borne fruit. In September 2020, online platform members Kristopher Matthews and Jaylin Molina were arrested on charges of conspiracy and attempt to provide material support to ISIS in violation of 18 U.S.C. § 2339B, in part for conduct they engaged in on the online platform that included detailed planning for jihadist attacks and sharing of instructions on how to make and use explosive devices. Matthews and Molina pleaded guilty and were recently sentenced to 20 and 18 year terms of incarceration, respectively, for those crimes.  Matthews and Molina admitted that Defendant radicalized them to ISIS's ideology, and that without Defendant's influence, they would never have committed the crimes to which they pleaded guilty.

Destroying The Evidence

iii. When Matthews and Molina were arrested for providing material support to ISIS, Defendant instructed online platform members to destroy evidence of their use of the group.  Defendant then established and used a second encrypted online group on Telegram whose purposes were the same as those of the prior online platform. Defendant's acts of directing the destruction of evidence speaks directly to his willingness to engage in conduct that would impede his prosecution, such as tampering with witnesses and evidence, flight, and additional acts of obstructing justice.

Finding Targets for ISIS

iv. In a discussion with the CHS about waging jihad by providing ISIS with intelligence on potential targets, Defendant told the CHS about Kirtland Air Force Base. Defendant drove the CHS to the base, described the normal entry methods to the base, and showed the CHS how "easy" it was to get on the base.  Defendant also suggested that the CHS find a woman with access to the base in order to assist him/her in getting

|      | |
|------|-|
|      | photographs and access. Defendant suggested that there were nuclear assets on the base and also told the CHS about a National Guard facility in Albuquerque where the CHS could also take photographs, and drove the CHS there. Defendant's attempt to inform ISIS of targets in the United States demonstrates his dangerousness in the form of spreading information that he intends to be used on behalf of ISIS. |

Attempting to Partner With ISIS

v. On January 12, 2021, Defendant told the CHS that he intended to email *Arkun* magazine, an ISIS-affiliated publication in Myanmar, about the establishment of his mosque, in hopes of securing financial support for Defendant's mosque. On March 12, 2021, Defendant emailed what he believed to be *Arkun*, asking for advice, networking services, and funding, claiming to represent Muslims who subscribe to ISIS ideology and that the mosque he intended to create would help ISIS to identify true believers and assist individuals who wished to travel and fight for ISIS.

Attempting to Provide Services to ISIS

vi. Defendant hosted a series of meetings in Albuquerque to organize and rally pro-ISIS individuals to jihad, further support, and possibly martyrdom.

vii. Attendees at these meetings discussed, among other things, attacking law enforcement, acquiring firearms, killing imams who do not support ISIS, and inspiring others to wage jihad.

viii. At another such meeting, Defendant emphasized the importance of learning to work as a unit when fighting, and explained that airsoft training could help prepare for the battlefield. Defendant stated that he had created several notebooks of different types of fighting techniques, such as boxing, martial arts, and grappling techniques. He drew

diagrams on a white board to explain how to conduct L-shaped and linear ambush techniques. Defendant also taught the male members of the group how to use pressure points to inflict pain and how to "choke people out."

ix. When the CHS informed Defendant that he or she was making hijrah, Defendant indicated an intent to provide the CHS with training to prepare him or her for hijrah. Defendant suggested that the CHS stay at Defendant's house prior to the group's next proposed meeting in order to receive training before the group meeting.

x. At that meeting, in November of 2021, Defendant provided the CHS with various trainings, such as proper shooting stances, individual combat movement techniques, the importance of a combat unit protecting its flanks from attack, and the importance of physical conditioning. Defendant also advised the CHS that he would train the CHS using an Airsoft replica of an AK-47, because that is what ISIS would provide the CHS for battle overseas.

xi. Defendant appeared more obsessed with war and combat during this meeting, showing the CHS various videos of combat techniques as well as war movies, where Defendant critiqued techniques in the videos, advising the CHS to avoid these mistakes. The CHS noted that Defendant frequently referred to the training he provided the CHS as something the CHS could use "over there," in "Egypt," and the "Sinai."

xii. Defendant then brought up the structure of the ISIS caliphate in Syria, particularly the department that controls education. Defendant emphasized that what he was doing in Albuquerque - specifically creating a mosque - was in furtherance of that department of the caliphate. The CHS noted that the structure Defendant speaks of and teaches, correctly reflects the modern ISIS caliphate, which is distinct from other caliphates.

</blockquote>

xiii. Defendant also provided the CHS a training manual Defendant had made for the CHS, showing various combat advice and techniques. Defendant instructed, drilled, and critiqued the CHS on room clearing, urban combat, and close quarters battle. Defendant explained he was training the CHS in these matters so that the CHS would survive in battle and return after completing his "mission."

xiv. Defendant advised the CHS on how to get accustomed to combat and shooting at people, and that the CHS should learn to control his or her emotions in battle because it is easy to kill with an AK-47. Defendant showed the CHS some knife-fighting techniques, and advised the CHS he or she would need this training on the battlefield or possibly in a knife fight in Egypt.

xv. Defendant insisted that he drive the CHS to the bus station when it was time for the CHS to depart. Defendant mentioned his own proposed eventual travel to Egypt and that he would likely be interviewed by Homeland Security when he traveled, as he was on a DHS watch list.

xvi. When Defendant drove the CHS to the bus station, the CHS asked Defendant what he would like the CHS to tell the brothers in Egypt about Defendant, and Defendant replied that the CHS could tell them about everything Defendant has done to support and promote ISIS. Defendant acknowledged that everything he had taught the CHS was to prepare the CHS for fighting for ISIS.

Collectively, the serious nature and circumstances of the charges and the strength of the evidence would almost certainly cause Defendant to flee unless he is detained pending trial. Indeed, the proximity of New Mexico to the southern border of the United States greatly enhances Defendant's flight risk. *Munoz-Hernandez*, 2012 U.S. Dist. LEXIS 161970, at *31-32

("[t]he fact that New Mexico runs along the Mexican border increases the risk of flight to Mexico" and "decreases the ability of law enforcement officers to timely respond to a defendant's flight, even if the Court were to require [Defendant] to wear a GPS device during his release.").

    C.    Defendant's Criminal History

Defendant is a convicted felon. In 1995, he was convicted on a state charge of armed robbery and sentenced to a term of 13 years' imprisonment. In 1997, Defendant was charged in state court with armed robbery, conspiracy, kidnapping, and possession of a firearm by a felon and sentenced to 18 years' imprisonment. In 2017, Defendant was convicted of a violation of 18 U.S.C. § 922(g)(1), Felon In Possession of a Firearm, and sentenced to 33 months' imprisonment and three years' supervised release. Defendant was on supervised release in that case until November 13, 2021. As noted in the indictment, Defendant's alleged criminal conduct pre-dated the termination of his supervised release term, which is another important factor the court should consider regarding Defendant's willingness to violate court orders and the law, as well as his comfort with concealing his conduct from the United States Probation Office.

    D.    Danger to the Community

Apart from the legal presumption of dangerousness, there is clear and convincing evidence that Defendant poses an extreme danger to the community. His pro-ISIS combat practice, stated desire to act on the violent aspects of his ideology, recruitment of pro-ISIS individuals, and attempts to provide lodging, training, transportation, and other support to ISIS followers demonstrate his danger to this community. Further, his radicalization of Matthews and Molina, who responded by disseminating instructions for making explosives to others demonstrates the dangerousness of Defendant's influence.

A halfway house is also entirely unsuitable for Defendant. Defendant has shown a desire to inflict violent harm on others on behalf of ISIS. He has researched and practiced techniques he could use to injure others in an effort to escape the halfway house. The halfway house also generally permits residents to possess wireless phones (including those with internet access) and it is unreasonable to believe Defendant could not gain access to a cell phone at the halfway house if he was determined to do so. Given Defendant's use of online media to radicalize others and marshal support, this is also dangerous to the community.

IV. CONCLUSION

The applicable factors discussed above should persuade this Court that Defendant must be detained pending trial. Clearly, there are "no . . . conditions [of release that] will" mitigate the risk of flight and extraordinary dangerousness posed by Defendant and "reasonably assure the appearance of [Defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Under these circumstances, this Court should remand Defendant to the custody of the U.S. Marshals pending trial on the indictment.

WHEREFORE, the United States requests that this Court grant this motion to detain.

Respectfully Submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

/s/
JON K. STANFORD
NICHOLAS MOTE
TAVO HALL
Assistant United States Attorneys

The foregoing was filed via the Court's electronic filing system on the 26th day of August 2022.

/s/
JON K. STANFORD

10